Case number 22-1335, Energy Arkansas, LLC, et al. Petitioners for the Federal Energy Regulatory Commission. Ms. Quinn Barabanov for the petitioners, Ms. Becella for the respondents. Good morning and may it please the court. I'm Jennifer Quinn Barabanov and I'm here on behalf of the appellants, the energy operating companies, which are engaged in the generation and sale of customers in Arkansas, Louisiana, Mississippi, and Texas. They belong to an organization known as MISO, which operates power markets in the central United States. This appeal involves FERC's approval of rules that implement a change in MISO's power capacity market from an annual construct to a seasonal one. The stated purpose of these changes was to enhance reliability, which is a laudable goal. But in this case, FERC failed to engage in the recent decision-making required by the Administrative Procedure Act. And just to be clear, because there was a lot of discussion about preservation of issues, is your appeal dealing with the 31-day rule, the 120-day rule, and then the capacity accreditation? Is there anything beyond that? No, it's those three issues, Your Honor. I think the 120-day rules is pretty adequately addressed in our brief, so I'm really going to focus today on the first two, the 31-day rule and the methodology. And just also, I'd like to reserve three minutes for rebuttal, if I may. Okay, so here, FERC engaged in a very conclusory analysis that failed to engage with the arguments that Entergy made, and its conclusion that the proposed changes enhanced reliability were, in the increased costs for Entergy's customers without any corresponding reliability benefits. And in some cases, they are actually inconsistent with the stated reliability goal. For these reasons, FERC's orders should be reversed and remanded. Did you offer any alternatives? I mean, we're talking about numbers, and reliability seems to be a fair goal. But did you offer any alternatives to the 31-day versus 120-day notice that is backed up by any research or other data? Well, there was data in the record that showed that the 31-day limit had a particular impact on nuclear resources, for example. So there was that. But FERC has an obligation, as this Court held in the Warner decision, that when it imposes a quantitative requirement, it has to articulate what the reasons are that justify that requirement, and why the one that's approved is reasonable as compared to ones that are higher or that are longer time period, although not a specific amount. But I guess what I'm asking is, is your position that you should just attack whatever FERC has put out as its premise, as opposed to offering alternatives? I'm not suggesting that you had to, but at the end of the day, we're looking at just and reasonable based on what it has presented. But if you haven't given us something else to consider, then it's harder to kind of contemplate that there is nothing else, or there is something else. Yes, Your Honor. But at the same time, the rule that's before you for review today is the 31-day rule. And one aspect of that in particular is very hard to square with FERC's own prior approved definitions, most notably the definition of maintenance margin. Now, Andrews, you raised the issue that the 31-day rule being applied to impose a penalty or a replacement obligation in periods of positive maintenance margin is actually at odds with FERC's approved definition of maintenance margin, which is defined as the projected megawatts of additional generation that can be taken out of service for planned maintenance within MISO during a given period, and this is the key language here, without impacting the adequacy of generation of supply. So by definition, then, when there's positive maintenance margin, there isn't a basis to believe that there's an increased reliability risk for having a longer outage. So they're doing four seasons a year. So that means each season is three months. And what FERC said is, and FERC has had, sorry, MISO has, sorry, I keep saying it MISO like issues. That's why it was changing all of this. There's no question that they needed to change things to ensure better reliability. Why? Well, if I get hired to do a summer job for three months, June, July, and August, and I get paid in advance to work three months, and I say, thank you very much, now I'm going to be out sick for bodily repairs for June and part of July, but I'm keeping the money, and the employer said, no, we're not going to let you do that. Would that be unreasonable if they've only hired me for three months, and I'm planning to be out for more than a third of that? Right. Would that be unreasonable? It, the lens that that reasonableness has to be evaluated through is the stated purpose of the change, which is to enhance reliability. Sure, sure. And reliability includes I need to have my employees here to do the work. I mean, the reason 31 days is theirs, that's a third of the season. And asking people who have committed to provide energy to be there for two-thirds of the season that they have committed for, having been paid for all three months, seems eminently reasonable to me. So what am I missing? Your Honor, because there's no basis in the record to conclude that the 31 days, that the days that the generator will be the maintenance margin definition, which FERC did not explain. So they want to get paid for more than 31 days without generating energy during those, say, 40 days. They think getting paid for not generating energy for 31 days is not enough. It needs to be 40 days. This is all scheduled maintenance. This is an emergency step. Yes, Your Honor, but the point is that that may be a fairness issue, but it's a reliability issue. It is reliability, because just like with my employee that I've paid, I'm laid out the money and that person's not going to be there during my busy summer season, that's reliability for the MISO grid as a whole. But that presupposes that those 31 days when you're taking a planned outage correspond to a period of increased reliability risk, which is not true because of maintenance margin. And then also there's no basis in the record to show that that 31 days is tied to times of greatest need. In fact, there's evidence in the record that shows that that 31-day rule is, in fact, inconsistent with reliability in some respects. That's not even a 31-day rule. It's a 62-day rule, because they say you can spread it over two seasons. Yes, Your Honor, but that suggestion that FERC makes actually underscores the arbitrariness of this rule, because it's not that— Are there any repair—these are planned repairs. Is there any evidence of record that says that 62 days is not enough time for planned repairs? Your Honor, the fact that there are 62—no, there is— So there's no evidence on that. So that can be done. So to the extent repairs are part of reliability, this rule fully addresses that. But there is evidence in the record, Your Honor, that not allowing units to take longer outages actually can be inconsistent with reliability in two respects. One, by discouraging prudent maintenance. And second of all, by encouraging— It's not discouraging if you can do 62 days. How is it discouraging? But the fact that the government suggests 62 days—first of all, there are questions about whether or not everyone will be able to do their maintenance and across— Is there any evidence in the record—that's what I asked you. I thought I started with that. Is there any evidence in the record that the 62-day window that's provided if you go across two seasons is not sufficient for all this reliability? I thought you said no, there's not evidence of that in the record. No, Your Honor, but there is evidence that it could actually undermine—whether or not particular units can do their maintenance in that period of time. There's data in there about the typical outages, and there is data that nuclear units in particular typically— Is there any data about typical outages or nuclear or steam turbine plant outages that exceeds a 62-day maintenance window? Your Honor, I don't know whether there's any, but the point is that there are— It's hard to knock for— But there are other impacts, Your Honor, for concedes that people may drop out of the market, which will decrease the amount of capacity that's available and increase its cost, and they also concede that the rule may encourage inefficient maintenance, which could be at odds with reliability in the long run. The seasonal capacity is not an end in itself. It's supposed to be— So they had to balance sort of pros and cons. Correct, Your Honor, and they didn't explain— How did they misbalance the pros and cons? They didn't explain how to square the rule with their approved definition of maintenance margin. That's, by definition, arbitrary and capricious. You can't have a definition that you've approved that says that it's okay to take units out of service and then ignore that in your reasoning to say that this additional requirement is necessary. What is your concern about what they're saying? Your Honor, the NJG doesn't oppose the goal here. Reliability is a laudable goal. I think the question is just whether or not the agency fulfilled its obligation to offer a reasonable analysis, and we don't think that that was true here. The reason I ask that question is because you say this goes against prior precedent. So I'm asking you, what do you believe this precedent says? I think this precedent really would be about what is present on this record, Your Honor, in terms of the explanation that's provided. It's not some per se, necessarily— What precedent is it going against? Well, I may have misspoke about the precedent. It's just the fact that FERC has this approved definition, and what it has done, its reasoning is inconsistent with that prior approved definition of maintenance margin. So turning to the SAC methodology itself, when fully implemented, the SAC methodology, the Seasonable Adjusted Capacity methodology for accrediting resources is arbitrary and capricious for two reasons. It is unreasonable because there is no basis in the record for FERC to have found that it's predictive, and it involves an unreasonable amount of volatility. So with respect to the first issue, whether or not it's predicted, the methodology suffers from a critical problem, which is that it very heavily weights a very small sample of hours. When it is finally implemented— Were you able to raise the sample size issue in your rehearing petition? Yes, Your Honor, I believe we did. I can get you the specific site to that on rebuttal, Your Honor, in terms of the page site. But I believe it was in the June appendix at page 785 to 789. We said that it was unreasonably volatile and a poor predictor of availability. So basically— I'm sorry. When you come up on rebuttal, please do tell me where you talk about sample size in your rehearing petition. Okay, that may be a shorthand for a way to refer to it. We certainly did criticize the— What is your shorthand? The sample size phraseology, Your Honor. But we did criticize the 65 hours adding up to a total of 90 hours. We did criticize the 3 percent of hours as opposed to thousands of hours. I understand, but that's not the same thing as an argument about sample size. Okay, Your Honor, I understood it to be the same. If there's something about it you think to be— Look, maybe this will help. So I thought there were two different issues. One was the argument I think you— I thought you preserved was saying that the tier 2 hours are arbitrarily small. Correct. There's a different issue that worries me that I don't think is preserved, which is when MISO was asked to show reliability, they came back with— I'm going to try to find it here. The 11 days, Your Honor. The 521, the 11 days with two regions. Something that I thought you meant by— And that's a different issue. It is. I thought that one was not preserved. Right. So, Judge Millett, I was referring— when I said sample size, I was referring to the 65 hours, the high, the tight margin hours that are weighted when it's ultimately implemented. 80 percent of the accreditation is based on 3 percent of the hours, and the remaining 20 percent is based on the remaining thousands of hours. The second point I mentioned I don't think is preserved. So, if you disagree, I'll give you a chance to point me to something on that. Right. So, I think the main— the argument related to the 11 days is not about sort of as a sample size, because I think it's kind of hard to understand. There's some ambiguity as to precisely what the data is. But with that said, I think we did preserve the argument that the problem with the data that MISO provided is that it is aggregated data. And because it is aggregated regional data, it cannot provide a basis to validate a methodology for accrediting individual resources. It's a total mismatch. And so, it provides no support. And that is true both in terms of whether the methodology is predictive and also in terms of whether or not the level of volatility is unreasonable. I mean, the RTO's concern is whether things work. On a system-wide level. Yes, Your Honor. But as we pointed out in our brief, we're dealing with load-serving entities here who have to plan around these accreditations. And some of them, particularly ones that are smaller and may not have diverse fleets, of which several categories that several of the energy operating committees fall into, are going to really have trouble adjusting to this volatility, in particular because the can't plan around an incentive that is essentially generating, based on a methodology to this, essentially generating random results because of that very small 65-hour over three seasons methodology. It's about the number of hours and the weighting of them. But on the 65 hours is small. It's three percent. Three percent of the hours get 80 percent of the weight. Yes, Your Honor. But, I mean, those are the three percent of hours that they care most about. Those are the hours when there's a reliability problem. Yes, but the question is whether those hours during a season are predictive of what's going to happen going forward. And really, the point is, is there a reasoned basis in the record for Do you think it should be 80 days or do you think it should be a smaller number of days? Your Honor, it should be enough to sort of, to compress the volatility to a reasonable amount, for one thing, which FERC didn't demonstrate what it did. And then, second of all, there should be some basis for determining that it's predictive. And it should be predictive of what it sets out to do, which is accredit individual resources. It's not about system-wide predictions. They say for stock sales, prior performance is no guarantee of future performance. But it may be in this context that they really have to sort of learn by experience. And so, why is it unreasonable to draw upon where there have been, you know, they say, look, we're going to look at the times when there have been the real problems. And that's not all 90 days or 91 or two days of our season. It is, we're going to focus on the 65 days. Your Honor, but there's no basis in the record to say that these historical data are going to be predictive of what happens in the future. Is your position that they should go back to the forced outage data that they did on their prior? Not necessarily. So, you don't know whether the numbers should be bigger or smaller. I haven't heard you say you have a position on that. And you say, we don't want, it's fine for them not to go back to the old scheme. And I'm not telling you there's a number bigger or smaller, but then they can't rely on history of past outages. I'm not sure what it is you think would be reasonable for them to do. Your Honor, in terms of the bigger or smaller number, I think that might've been some confusion as to which data set we were talking about. So, with respect to the 65 hours, 65 hours. Yes, Your Honor. No, that's okay. Thank you. So yeah, I mean, we think that a bigger set or a longer historical window where maybe the season shouldn't, should, you know, maybe the seasonal methodology, that's not something we challenge, but FERC hasn't articulated a reasoned basis for why those particular, that particular number of hours or why that waiting is necessarily appropriate. And that's really where we take issue with it. So, you want, did you propose to FERC a different number, I don't know, I keep thinking days, hours, or different waiting? And they are, because they are, by the way, they sort of are integrating this with different waiting over, I guess, the first three years of compliance. Yes, Your Honor. But the, but the, but the argument that FERC makes to defend that, which is that, you know, you can adjust based on the phase-in doesn't justify the- I understand that, but I'm just saying, so there were other statistics there and I didn't know if you had argued to FERC that, you know, that thing you're doing the first year, that, that different percentiles between the two tiers should be, should be what you're doing long-term, or are you simply saying that what you did is wrong, but you didn't offer FERC a position on what percentiles, what, what I think what you're referring to waiting, you mean the different percentiles for tier one and two? Correct. So, different percentiles, you didn't offer that, and you didn't offer a number, different number of hours? No, Your Honor, I don't believe we did, but the purpose for today is what, but we did raise these concerns about the methodology, and under the APA, FERC was obligated to respond to them and offered a reasons analysis, and it did not. On the point whether the, whether there's evidence that the method is predictive, you're running a little bit uphill because they get a fair degree of deference for fact-finding or predictive judgment and such. Back to the chart I mentioned at 521 and 522, I can't pretend to understand all of it, but it does seem to be some evidence that in particular regions, yeah, I'll let you, in particular, particular seasons, in particular regions, the UCAP methodology worked better than the UCAP methodology. So, am I mischaracterizing, am I misunderstanding what that chart is showing? That is what the chart shows, Your Honor, but there are two issues with the chart. One is, and the primary one is that it doesn't validate what this methodology is supposed to do. There was no... Then they have some evidence of that these aren't enough entries or they're cherry-picked or who knows, but you didn't make that argument. But Your Honor, the point here is that it doesn't, it doesn't, FERC has made no connection between this aggregated data and the validity of this method for accrediting individual resources. We did raise a concern that there was no data provided that related to the, whether the, this methodology was reasonably accurate in doing what it was designed to do, which was to And there was evidence in the record to show that at the market participant level, which, again, is still aggregated data, not at the individual resource data level, but that volatility could be as much as 20 percent year over year. And FERC concedes that the methodology will increase volatility at the, at the individual resource level, but it doesn't... Not at the rates that you proposed. They calculated that volatility would be much lower than the example that you thought that a worst case scenario that you thought could happen. So they did, Your Honor, but again, that was MISO wide. Okay. So fully aggregated data, the data that we cited to for the 20 percent figure was more granular, but still aggregated data. And that's, you know, that volatility, FERC acknowledges that volatility is an issue and that it comes with costs. And the question really is, has FERC engaged in a rationalized reasoned explanation for why utilities should incur these costs based on flawed methodology? Your Honor, here they haven't provided any explanation for why the amount here is reasonable. So it's not inherently unreasonable. You just want more explanation for why they're willing to tolerate this level of volatility balanced against the other goals they're trying to achieve. What we would like to see, Your Honor, is an analysis of what the volatility is at the individual resource level, and then to have FERC pass on that. So then is it the error... If we read the record as of having looked at some individual levels, that's one thing. On the other hand, so your position is it's just inherently unreasonable for FERC to have done this only at the sort of... Aggregate... ...big-wise level. Correct, Your Honor. The best authority for that is? It is the Keyspan case, Your Honor, which basically lays out that when FERC makes a decision, particularly in that case about accreditation based on a limited data set, it has to show why that was reasonable, and it has to show that it was consistent with promoting the stated goal of reliability. Why does volatility matter apart from accuracy? The method is accurate, and one thing they said on volatility was that the swings reflect... They think the method is accurate, and therefore the swings reflect underlying supply fundamentals. And I take it you disagree with that premise about accuracy, but what's the volatility concern above and beyond whether the method is accurate? Well, two things, Your Honor. First of all, historic fundamentals is an interesting term because in our view, there shouldn't be these swings in accreditation if the operating characteristics of the unit remain the same. There may be things that happen, some of which are the result of happenstance. Something breaks. There's a max-gen event that is caused by an outage somewhere else, but the costs of the volatility are several. One is that it makes it extremely... The primary one is that it forces utilities to incur expenses either by going to the market or by building additional capacity based on a methodology that is flawed. And the whole notion that they're going to be able to plan around this and predict the accreditation, which is what FERC suggests, is just implausible. If the methodology is fundamentally flawed, it is not sending accurate signals that people can respond to. We will give you a couple minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. Beth Pescella for the commission. I think I'm going to start with the argument that the petitioners actually made in their opening brief regarding individual analysis regarding accreditation and whether it's predictive. Their argument actually was at page 38 of their opening brief. For one thing, MISO's quantitative analysis does not look at the performance of individual resources. The appropriate test of whether the seasonal methodology is better or worse at predicting. And that's not the issue before the court. It wasn't the issue before the commission, and that's not the issue before the court. The issue is whether this proposal, this section 205 proposal, is just unreasonable. So whether it's better or more or less predictive than before doesn't matter. So the individual issue was only raised in that context. It was not raised in a different context. And so there's no answer in my brief to because it wasn't raised to the commission and it wasn't raised in its opening brief. And as the commission found quite reasonably that there's not undue volatility here. The commission acknowledged that it's expected that accreditation volatility at the resource level will be higher than aggregate level volatility. But the commission found for several reasons that any volatility at the individual level would not be unreasonable. As the court already mentioned, any individual volatility would just reflect the availability in the past three years, historical availability. Secondarily, the commission extensively discussed the mitigation measures that would decrease any volatility that would occur. Several aspects of the proposal that will mitigate volatility and petitioners don't argue here that they're not. And I'd be happy to talk about each of them if you'd like. The third thing the commission said was there are substantial benefits to the proposal. And fourth, that the benefits outweigh any volatility. So it's not that the commission didn't recognize that there would be volatility, but the commission recognized that the volatility would in the first place be appropriate, it would be extensively mitigated. And the benefits of this proposal are incredibly important critical reliability benefits were necessary if that volatility occurred. Can we go back to accuracy for a minute? Sure, absolutely. Seems like that's a critical issue in the system where 3% of the hours drive 80% of the calculation. Sure. The commission itself raised that question in, I forgot what it's called, the compliance order. And MISA came back with this chart that I mentioned, which I have to say it looks somewhat flimsy. 11 days, two items, no indication that this is a representative, these data points are representative. How much confidence can we have in that? Tremendous confidence because as the independent market monitor explained, this is compelling took this exact methodology and it applied it to two historical circumstances of maximum generation events. And it showed that applying it in these two seasons, it had a deviation of only 0.8% in the summer season and minus 1.2% in the winter season. So this exact methodology has been proven to actually work. And nobody argued, particularly petitioners, that more season, more analysis should have been done, more extensive analysis should be done. I take the forfeiture point. Maybe that's all you need, but sorry. How do we know that these two are sufficiently robust and not cherry picked? So again, nobody argued that, so I don't know what the commission would have said in response to that. I'm sorry, Your Honor. But this commission's second point, which in the rehearing order, JA 815 paragraph 26, is that this methodology also considers all reasons, unlike the prior methodology. And so that in and of itself, it'll make it innately predictive because it considers all reasons for having an outage, not being available. And what's the precedent that this opinion is going to set when there are other RTOs that transition to seasonal maintenance or adequacy construct? So I think that just like in any circumstance, if any other region wants to come in and do a similar thing and move to seasonal, if they find that the record supports their need to do so, like it did here, then you need to have real quantitative evidence to support the predictiveness of this. And you have to show that it's just and reasonable. I mean, circumstances can be different. Every region is different. I don't know that another region have to do their own analyses and have their own proof. Well, you've got Commissioner Clemons' dissent on various factors, and it seems to go to that, do you need to move beyond more than just the status quo? Is this just an incremental change, and then we see how it works out, and then we're right back here again? I think most of the dissenting Commissioner's concerns are the issues that weren't preserved here. So that's just a short answer, but I am happy to just talk in general. You know, the Commission is allowed to do something that is predictive, and then it's set forth this information report requirement for the very specific purpose of let's make sure that this is working. So there will be a check on this, just like so responsibly the Commission did that. It didn't just say, we found this just and reasonable, and we're done. It will be looking at this information report after the first three years of this methodology being used, and it will have that opportunity, and so will the public have that opportunity to determine whether things are sufficient. FERC isn't making this up. It's presented to it by the independent system operator based on what they think their grid needs, and I suppose other ISOs may have different proposals, and everyone may watch and learn from this. That's exactly right, Your Honor. That's right. So the regional operator is an expert in its own region. FERC is an expert on top of that, and really petitioners don't present much. And the market monitor thought you didn't go far enough. Right. That's right, Your Honor. And what's your position with respect to criticisms regarding, like, for example, PGM? There was a much longer ramp-up period. So, and again, that's an issue that is an intervener-only issue, so that's not properly before the Court, but I'm still happy to talk about it. The Commission explained the difference between those cases. The first one, the reliability pricing model order, there the four-year transition period was to allow a brand-new market, and so that's just, you know, one year longer, and it's an entirely new market versus just a change to portion of this market. And the second case, the capacity performance resource order, there there was a proposed five-year transition period, but the difference here is there was an urgent, the record establishes an urgent need to implement this in the near term. So allowing a five-year transition period of this waiting of the 80, you know, to get to 80-20 really is a viability issue, and it doesn't provide the incentives. The whole point of the 80-20 waiting is to give market participants incentive to have their capacity that they commit to the market and are paid to provide actually be available. I mean, that's the whole point of having a capacity market is about reliability and making sure that there are, that that's, it's available. As this Court explained, excuse me, as the Court explained, in some case, I apologize, the whole purpose of it is that, and it's in my brief. And I think there's just one more thing, I think the Court understands my point. I just wanted to talk about maintenance margin for a moment. You know, the Commission explained and petitioners do not rebut the fact that maintenance margin does not provide a complete picture of system reliability, and that's because it considers only planned, not any other type of outage. And the fact is, if parties are waiting, that's a big point about why you need 120 days notice, because if somebody gives enough notice, then it's part of the maintenance margin analysis. So maintenance margin doesn't tell you, it only tells you what the ISO knows is already, has been announced as a planned outage. But if people have later planned outages, that's not part of the maintenance margin analysis on top of everything else the Commission said. On this, there does seem some tension though with rigid rules around maintenance and going offline for care and tending to these really important facilities. And I'm just, there's some, you don't, you don't want to encourage, you don't want to incentivize them to keep operating if there's, if they really need to be doing some maintenance. You know, it's, it's, it's fine balance here. And as I understand the plan, there's a couple, the theory is they can always go ahead and do their maintenance. They just might either have to, there are different options. One of them is to opt out of the capacity market. That's right, Your Honor. How does one, is that, is that, does that mean just not bidding in the first place, or is it something you can do after you've already bid in? You don't commit yourself to the market. You don't offer your capacity to the market. You just commit and then somehow get back out. Right. It's just not joining the market. And that's, that is a pro-reliability thing. The Commission, the point of this proposal is not to have the most potentially available capacity in the market. It's to have more certainly available capacity in the market. Well, they don't know far enough in advance to opt out for an entire season of capacity, which seems to be a very, very difficult decision for them to make, obviously. And they wanted to, something came up, they really thought they should deal with it now, but it was going to take more than 31 days. They need to deal with it sort of mid-season. It's the, the plan says that they can acquire replacement capacity. Can you just explain to me how that happens? Do they buy it off one of the other, like, I don't know, a day ahead market, or what, how do they, how do they get this replacement capacity because they themselves are replacement capacity? Right. The Commission spoke to that in the first order and in the hearing order as well. Those with a large number of resources can rely on their fleet to provide that capacity. I was talking about, would they acquire replacement capacity from some other? Well, this is, this is, this is how they do it. Sometimes you can just self-supply. Okay. So with small, with resources that have smaller, you know, entities that have smaller resources, they do it through bilateral agreements and the capacity auction. And the Commission explained, and the record showed that excess capacity is expected to be available because as Mr. McFarland's, Mr. McFarland's evidence showed, his testimony showed, under the proposal capacity reserve requirements are going to be generally lower in non-summer months because it's now not going to be the annual one-day peak summer time. Each season will have its own, will have its own capacity reserve requirements. So they'll be lower and there's likely to be excess capacity for those seasons that entities will be willing to sell. And the evidence actually showed that the move to seasonal, the seasonal construct will result in nearly double the amount of uncleared zonal resource credits in non-summer seasons. So there you go. Thank you very much. Thank you. Okay. And Barabanov, did I say that correctly? Yes. Just a few brief questions in rebuttal, Your Honor. I'm going to give you two minutes. I just wanted to say that. Thank you. I apologize. Okay. So going back to your question, Judge Millett, and one that you raised, Judge Childs, about whether or not there were alternatives proposed, I just wanted to point out that this was a 205 proceeding in which FERC was supposed to just either approve or disapprove of the MISO proposal. And so the comments were made in that context. Second point, Your Honor, is that, you know, again, with respect to the definition of maintenance margin, that there really isn't an adequate explanation for why that is not sufficient here based on FERC's own definition, either in their briefs or in the decision we're here today. Because by definition... I thought her explanation was it doesn't work if, one, if we don't know well in advance who's going to be using it. Because everyone could go, aha, you could have some large percentage of the capacity for any given season say, aha, we're going down in July for maintenance. That's our best time to do this maintenance. But if maintenance... One doesn't know what the other is doing and suddenly they've got, you know, a large percentage of the capacity offline all at once. And each one individually looked at maintenance margin not knowing what any other supplier was going to be doing. Isn't that the problem? Well, maintenance margin does take into account what other people are doing. If you don't challenge 120 advance notice, but if they don't have enough advance notice, then if everyone shows up on the same day thinking nobody else was going to be doing it, it's going to be a problem. It's not going to work. Your Honor, I just... The definition says that it will not impact the adequacy of supply when there's positive maintenance. They have to know well in advance who is planning to do their maintenance the first week of July. And I assume that suppliers don't all talk to each other and say, hey, I'm going to take the first week, you want to take the second week. I assume they just simply lob in their requests. And maintenance margin is adjusted based on those requests that come in. But if they all come in simultaneously, what happens? Then they need to be vetted and approved based on what the margin is going to be. And that changes over time. Going also to the SAC methodology... What about surprise force outages? Well, that also goes to... There's a lot of balancing they have to do here. And it's a lot the suppliers to make their own decisions about this. They only considered forced outages. And that's what was not working for them. So I'm just having a little trouble understanding what's so wrong about them imposing some more constraints and rules about the process, as long as anybody who needs to do repairs can do them whenever they need to do them through these alternative methods or spreading it over two seasons. That's what I'm having trouble understanding. Your Honor, there's nothing wrong imposing some constraints per se, but they should be consistent with the definitions that FERC has already previously... They had maintenance margin in the old scheme, and that wasn't enough. Maintenance margin is an invention of this scheme, right? They had that last time. That wasn't enough to protect them. Your Honor, but they have to square their reasoning. To say it doesn't provide a complete picture doesn't support penalizing generators for engaging in prudent maintenance. Because in some cases, the record is clear that longer than 31 days can be prudent. And just to make a couple of really quick points on the methodology, Your Honor, the point that now the 65 hours accounts for forced outages as well as planned outages, and that that makes it better, that doesn't change the fundamental problem really, right? Which is that there is this very small sample size of the 65 hours a season and heavy weighting. And so what's considered doesn't really change that fundamental problem and that the results are going to be plagued by randomness. Thank you. Any questions? Thank you very much for your time. Counsel is submitted.
judges: Millett, Katsas, Childs